WILLIAM H. PHINNEY *vs.* MOREY GARDNER et als.

Washington. Opinion December 20, 1921.

*In a description in a deed the following words, "the same being intended for a burying ground and. to be used for no other purpose," import merely the purpose of the parties, and in no way legally limit or restrict the title, or constitute a condition subsequent. Abandonment at common law does not apply to real estate. Title by adverse possession not sustained.*

·In the instant case, an action of trespass against the selectmen of a town acting under a vote instructing them to cause the boundaries of a cemetery lot to be plainly marked, the deed of said lot to the town containing the following words, "the same being intended for a burying ground and to be used for no other purpose," it is

*Held:*

1. That the words in the deed as to the use of the lot do not limit or restrict the deed or create a condition subsequent, but merely import the intention of the parties as to the future use to which the lot was to be devoted. The title in the town was an absolute fee.

2. There was no legal abandonment by the town. That term at common law applies to personal property and to inchoate and equitable rights and incorporeal hereditaments, but not to real estate.

3. Nor has the plaintiff proved title by adverse possession. The only acts relied upon appear to be occasional trespasses by wandering cattle rather than an open, notorious, hostile, exclusive and adverse occupation under a claim of right. Moreover, as long as the lot continued to cherish the remains of those once buried there, we should hesitate to hold that the possession by the town had been or could be interrupted or invaded. Burial grounds are not the subject of trade and commerce, but are in a sense consecrated ground, and the law should and must protect them as such.

On report on agreed statement. This is an action of trespass brought for the purpose of determining the title to a lot of land in Machias of about four acres. The inhabitants of the town of Machias for their title relied upon a deed, dated May 1, 1841, describing the lot and concluding with the following sentence: "The same being intended for a burying ground and to be used for no other purpose." Plaintiff claimed title by adverse possession, and by abandonment by defendants. By agreement of the parties the case was reported to the Law Court upon an agreed statement of facts. Judgment for defendants.

Case is fully stated in the opinion.

*Gray & Sawyer*, for plaintiff.

*C. B. & E. C. Donworth*, for defendants.

SITTING: CORNISH, C. J., SPEAR, HANSON, DUNN, MORRILL, DEASY, JJ.

CORNISH, C. J. This is an action of trespass quare clausum to try title to a four-acre parcel of land in Machias, used as a burying-ground, and is before the Law Court on an agreed statement of facts.

On May 1, 1841, Amos B. Longfellow and Amasa B. Longfellow conveyed this lot by warranty deed to the inhabitants of Machias, describing it by metes and bounds, the description concluding with these words: "the same being intended for a burying ground and

to be used for no other purpose." Under this deed the defendants, who were selectmen of Machias, and acting at the time of the alleged trespass under a vote of the town, claim title in the inhabitants of the town and defend as their agents. This four-acre lot was part of a larger parcel used as a pasture, and the plaintiff is the admitted record owner of the pasture through mesne conveyances from Amos B. Longfellow, he having made with Amasa B. Longfellow parol partition of the premises held by them as tenants in common. In this suit he claims also to be the owner of the cemetery lot and bases his contention upon either of two grounds, abandonment of the lot by the town, or upon title by adverse possession through himself and his predecessors.

Before deciding these contentions it may be well to consider the legal effect of the words in the deed to the town, viz.: "the same being intended for a burying ground and to be used for no other purpose." These words import merely the purpose of the parties when the conveyance was made and their intention as to the future use to which the lot should be devoted. They did not in any way legally limit or restrict the title, nor did they constitute a condition subsequent. In *Rawson* v. *School District*, 7 Allen, 125, the words of the habendum were as follows: "to the said town of Uxbridge forever, to their only proper use, benefit and behoof for a burying place forever." In *Barker* v. *Barrows*, 138 Mass., 578, the conveyance was to the inhabitants of a school district, and this sentence followed the description: "Said lot of land to be used, occupied and improved by said inhabitants as a school house lot and for no other purpose." The court held that in neither instance was an estate upon condition subsequent granted. At most the words in the deed under consideration imposed but a moral obligation upon the town to use the premises for no other purpose than for burial. The town has faithfully fulfilled this obligation, except that for several years, just when and for how long the record does not disclose, a schoolhouse was maintained upon the lot by the town but was removed prior to the plaintiff's deed in 1891. The title of the town, therefore, under its deed was an absolute fee.

### 1. ABANDONMENT.

There is no opportunity for the application of the doctrine of abandonment in the case at bar. "The characteristic element of

abandonment is the voluntary relinquishment of ownership, whereby the thing so dealt with ceases to be the property of any person and becomes the subject of appropriation by the first taker." 1 R. C. L., Page 2. The term is used in connection with personal property, inchoate and equitable rights, and incorporeal hereditaments, but "at common law a perfect legal title to a corporeal hereditament cannot, it would seem, be lost by abandonment." 1 C. J. Page 10. Its very essence is inconsistent with the attributes of real estate. Moreover, it is inconceivable that the inhabitants of a town, even if they had the legal power so to do, would voluntarily abandon a lot set apart for burial purposes and in whose soil five persons were sleeping the sleep that knows no waking. Such an act, even if legally possible, would be little less than sacrilege. Had any one without the permission of the town clerk wilfully removed a single body from the lot he would have been guilty of a criminal offense and subject to punishment. R. S., Chap. 126, Sec. 42.

## 2. ADVERSE POSSESSION.

After receiving its deed the town went into immediate possession of the lot, as appears from the agreed statement, cleared off surface rocks, constructed a wall of split boulders one rock in thickness and three feet high, as a retaining wall laid up against the bank along the front or highway side of the lot and said wall is still standing in fair condition for two-thirds the width of the front and in a dilapidated condition the remainder of the distance. Not long after the lot was conveyed to the town, five persons were interred within its limits, but their graves are unmarked and cannot now be located. Later on a schoolhouse was built by the town and used for several years before its removal. In 1901, nineteen years before this suit was brought, someone claiming to act for the town renewed the boundaries of the lot by spotting the trees on the lines. The town records show no vote authorizing such action, but it is difficult to believe that the person was not acting in the interest of the town. The lot is now grown up to trees and bushes, but on the easterly line as now spotted is a ridge of field rocks gathered from the cemetery lot and extending nearly the length of the line which is a little over twenty-five rods in length, and on the westerly line is a similar ridge of rocks running a few rods southerly from the highway, so that with the stone wall in front the lines of the lot are somewhat defined on three sides.

Finally, at a meeting held on March 22, 1920, the town voted to accept the report of a committee previously appointed, "they recommending that the land known as the cemetery lot in Atus District be acquired for a new cemetery and to authorize the selectmen to borrow money for said purpose on the faith and credit of the town." The use of the word "acquire" is commented upon by counsel for plaintiff as negativing the idea that the town still owned the lot, but it will be observed that this was the language not of the town but of the committee, and if not a happy expression as stating the exact situation it was the verb of the committee and not that of the town. The next vote clearly shows the attitude of the town, viz.: "Voted that the selectmen be authorized to have run out the lines of the town cemetery lot situated in Atus District, and which was conveyed to the town by Amos B. Longfellow and another by deed dated May 1st, 1841, and to cause the boundaries thereof to be plainly and permanently marked and the expense so incurred to be taken from the contingent fund." This vote carries no uncertain sound as to claim of ownership of the "town cemetery lot" and it was because of the acts of the selectmen in carrying this vote into execution that the present action was brought.

The plaintiff has failed to prove the necessary elements that ripen into title by adverse possession. The use of the cemetery lot as a pasture in connection with his own by the owner of the balance of the large lot, there being no division fence enclosing the cemetery lot, is the only act tending to show adverse possession and this would appear to be occasional trespasses by wandering cattle rather than an open, notorious, hostile, exclusive and adverse occupation under a claim of right. Moreover, as long as the lot continued to cherish the remains of those once buried there we should hesitate to hold that the possession by the town had been or could be interrupted or invaded. Burial grounds cannot be regarded like other tracts of land. They are not the subject of trade and commerce. They are in a sense consecrated ground and the law should and must protect them as such.

In order that there may be no misunderstanding as to a legal principle involved, it should be added that after the passage of R. S., 1847, Chap. 147, Sec. 12, and until its repeal by Public Laws, 1885, Chapter 368, a period of thirty-eight years, the State and therefore a political subdivision thereof might as a matter of law, if the facts

warranted, be disseized of its public lands by twenty years adverse possession. *Roberts* v. *Richards*, 84 Maine, 1; *United States* v. *Burrill*, 107 Maine at 386. That statute when in force limited the effect of the common law rule that "Nullum tempus occurrit regi." But the evidence in this case when applied to the character of the occupation by the town during those thirty-eight years falls far short of proving adverse possession. Since 1885 the only exception to the common law rule in this State relates to the maintenance of buildings and fences upon any way or land appropriated to public use for forty years or more, R. S., Chap. 24, Sec. 106, and this gives title to the land so occupied only to the extent of the occupation. *Stetson* v. *Bangor*, 73 Maine, 359; *Charlotte* v. *Pembroke Iron Works*, 82 Maine, 391; *Kelley* v. *Jones*, 110 Maine, 360.

The plaintiff having failed to prove title as claimed, the entry must be,

*Judgment for defendants.*